IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff,* | Case No. 1:22-cr-615 |
| v. | |
| LAWRENCE STURDIVANT, | Judge J. Philip Calabrese |
| *Defendant* | |

**DEFENDANT STURDIVANT'S PRELIMINARY MEMORANDUM OF ARGUMENTS SUPPORTING A MOTION TO SUPPRESS**

At the status conference on January 30, 2024, the Court directed Defendant Lawrence Sturdivant, through counsel, to submit a preliminary memorandum outlining his planned motion to suppress. As Mr. Sturdivant outlined in his latest status report and at that status conference, (ECF No. 58), his counsel has been working diligently to obtain records and other information related to Automated License Plate Reader ("ALPR") systems in the greater Cleveland area from both private and governmental parties—but has run into obstacles, including what is apparently a complex ALPR program governance structure and, in some cases, either begrudging compliance with defense subpoenas or a failure to respond to them altogether.

Because Mr. Sturdivant was allegedly identified in connection with the crimes described in the indictment because of an ALPR query, the constitutionality of that query is a critical question in this case. Given the difficulties Mr. Sturdivant has encountered in gathering the information he needs to make his motion and allow the Court to answer that question, he is requesting an evidentiary hearing to which he may subpoena witnesses to inquire into (1) the scope of the ALPR

system in the greater Cleveland area, (2) the capabilities of that system, and (3) the ways in which the ALPR system was used in this case.

This memorandum outlines, in summary fashion, the facts Mr. Sturdivant has developed so far, the additional evidence he hopes to gather from subpoenas and witness testimony, and the legal authorities he believes would support a motion to suppress.

**I.     BACKGROUND**

Mr. Sturdivant anticipates the evidence presented at a hearing will show the Cleveland-area ALPR system allows law enforcement to track citizens' movements in detail over a historical period of at least 30 days and up to one year. Indeed, the evidence collected so far already points in that direction. (*See* Section I.(B.), *infra*.) And Mr. Sturdivant anticipates evidence presented at a hearing will bolster his claim. (*See* Section I.(C.), *infra*.) But first, we provide a brief recap of how ALPR data is connected to this case.

**A.     Connection with this case.**

On October 27, 2022, Mr. Sturdivant was charged with ten counts of violating 18 U.S.C. § 1951(a) (Interference with Commerce by Robbery); three counts of violating 18 U.S.C. § 924(c)(1)(A)(ii) (Use, Carry, and Brandish Firearm During and in Relation to Crime of Violence); and one count of violating 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Felon in Possession of Ammunition). (*See* Indictment, ECF #20.) On May 30, 2023, the undersigned was appointed as CJA counsel for Mr. Sturdivant.

The Government generally alleges that Mr. Sturdivant committed a series of robberies at retail stores located within the Northern District of Ohio between December 5, 2021, and December 26, 2021. Private surveillance camera footage from near certain robbery locations identified what investigators believed to be an ***unidentified*** black Chevrolet Camaro with

*unreadable* temporary tags and a white bumper sticker. Because investigators could not read the temporary tag from the private surveillance footage or otherwise identify the black car, they were effectively at a dead end in the investigation. Therefore, investigators turned to ALPR cameras—located in various locations in and around the Northern District of Ohio—and searched those cameras to identify a suspect vehicle which ultimately, through subsequent investigation, was believed to have been associated with Mr. Sturdivant.

According to a document provided in discovery, ATF Industry Operation Intelligence Specialist ("IOIS") Michael Thrush, using the private surveillance footage of the unspecified black car as well as search terms[1], warrantlessly queried several law enforcement databases, including the Flock Safety system. Other discovery provided by the Government shows the Leonardo/ELSAG camera system was also utilized, without a warrant, in the investigation. These ALPR queries matched the private surveillance footage of the unidentified black car to pictures of a black Chevrolet Camaro, bearing Ohio temporary license plate number N472040, registered to Mr. Sturdivant. Using this ALPR information, investigators developed Mr. Sturdivant as a suspect in this case and eventually obtained additional evidence allegedly connecting Mr. Sturdivant to the crimes charged in the indictment. However, the use of the ALPR camera systems was a seminal point in the otherwise dead-end case, from which the rest of the investigation flowed.

B.  **Current Understanding of the Cleveland-area ALPR system.**

Next, we provide a brief overview of what counsel's investigation to date has revealed about the ALPR system covering the greater Cleveland area.

---

[1]  These search terms include, among other things, "Chevrolet Black No Plates," "Chevrolet Black All Images Ohio," "Black All Images Temporary Tag Ohio Tennessee Georgia Indiana," and "All Images Temporary Tag Ohio Tennessee Georgia Indiana."

— 3 —

Counsel has learned that the ALPR system at issue in this case involves two distinct camera "systems." The first is a network of fixed ALPR cameras and software provided by Selex ES, LLC. ("Selex"), a subsidiary of Leonardo S.p.A. ("Leonardo"). We will refer to these cameras as "ELSAG Cameras." This network, in the Cleveland area, was established and is apparently controlled by the Cuyahoga County Sheriff's Office in coordination with other law enforcement agencies and has been substantially funded through federal grants. It is our current understanding that the system is hosted by the Chagrin Valley Dispatch, which coordinates first responders in Northeast Ohio. A contract between Selex and Cuyahoga County ("the County") states Selex will provide the County "[s]oftware that has the ability to access the successful vendor's customer database without any additional cost from County." The County's grant proposal reveals the County has access to the "ELSAG Operations Center software suite," which has built-in data mining tools and can store geospatial information associated with each read that can be analyzed to detect patterns of behavior.

Based on a list of cameras provided by the County, we are aware of at least 75 ELSAG cameras located in at least 20 Cuyahoga County communities. And a 2017 grant application called for additional cameras. It is our understanding the County continues to pursue additional funding and install additional cameras around the area. The County's ALPR policy provides that the footage captured by these cameras will be retained for 365 days from the date of collection.

The second system (or, in reality, a system of a system) is operated by Flock Safety Co. ("Flock"), a private ALPR provider that rents cameras to law enforcement agencies and allows them to access and query those cameras via a cloud-based software platform. That platform also permits law enforcement agencies (as well as private customers, such as apartment communities) to allow other Flock customers to access their cameras, forming an interlocking network of

— 4 —

cameras across multiple customers. Because Flock has, to date, failed to comply with the subpoena this Court authorized, we are not able to estimate the number of Flock cameras in the greater Cleveland area.[2] But our understanding is that they are widespread and that local, county, state, and federal agencies have contracts with Flock.

According to the company's website, Flock cameras can search not only license plate numbers, but also (as was done in this case) vehicle features including damage, temporary tags, decals, and alterations, and then use those features to track a vehicle across multiple cameras. Flock is also able to provide customers with software that turns their existing internet protocol cameras (commonly known as IP cameras[3]) into ALPR readers through what it calls "Wing" integration.

In this case, ATF ran broad searches across ALPR cameras in at least three states and obtained 22 hits on a suspect vehicle (which it has allegedly tied to Mr. Sturdivant) from various ALPR cameras. Those hits included queries to both the ELSAG and Flock camera databases and were the necessary basis for a later warrant to search Mr. Sturdivant's vehicle and other property. Because the data provided only shows hits the Government alleges applied to Mr. Sturdivant, it is not clear, at this point, whether the Government also investigated hits on other potential suspect vehicles—or, if it did, how many.

---

[2] The deadline for Flock to respond to the subpoena was February 15, 2024, which passed with no response from Flock, despite counsel's numerous attempts to contact its representatives. On February 26, 2024, counsel reached out to Flock as a courtesy to inform the company that it would be the target of a motion to compel. The same day, a representative of the company belatedly replied and told counsel that the company was willing to discuss what it was willing to produce. That conversation is ongoing.

[3] IP cameras provide digital video surveillance by sending and receiving footage over the internet or local area network (LAN). As their name suggests, IP cameras connect to a network through Wi-Fi or ethernet cable.

More generally, the amount of data that an ALPR system can collect is staggering. For example, Piedmont, California's 30 license plate readers generate somewhere between 1 and 1.4 million records **each month**. Cyrus Farivar, *Habeas Data: Privacy v. the Rice of Surveillance Tech* 87 (2018). Such comprehensive monitoring provides a lot more detail than one would think. For example, when a man from San Leandro, California submitted a public records request to see what ALPR data the government had on him, he received more than 100 photos, including wide shots of his car at a coffee shop and a friend's house. (*Id.* at 84.) As already discussed in this memorandum, there are well over twice the number of ALPR cameras currently active in the Cleveland area as there were in Piedmont, even counting only the ELSAG cameras.

    C.    **Proposed Hearing Testimony**

Based on the information above and additional evidence counsel has gathered over the last several months, Mr. Sturdivant anticipates the testimony at an evidentiary hearing will document a comprehensive and invasive ALPR surveillance system that raises substantial Fourth Amendment concerns. Without waiving the right to call additional witnesses or rebuttal witnesses, counsel currently anticipates calling five witnesses to testify at a hearing.

*First,* Mr. Sturdivant would call Garrett Langley, the CEO of Flock Safety (or a suitable representative) to testify as to the functionality of the Flock system, his company's contracts with Cleveland-area law enforcement agencies and other entities, and the number and location of Flock cameras in the greater-Cleveland area. Mr. Langley's testimony is even more vital given his company's failure to comply with the subpoena issued by this Court despite repeated outreach from Mr. Sturdivant's counsel. If the ongoing conversations with Flock prove fruitful, it may be possible to substitute a different Flock representative for Mr. Langley, assuming that representative is better able to testify to the relevant issues.

Counsel has been unable to establish how many different agencies share data, but it is clear from the discovery that the ALPR systems cross state lines. Even the local police departments have been unable to shed light on how many other agencies (not to mention private cameras that have opted into sharing camera data with law enforcement) share data; hence the need for a representative from Flock to testify to the interconnectedness of the Flock ALPR system.

*Second,* Mr. Sturdivant plans to call Jason Laquatra, the Executive Vice President and General Manager of ALPR systems from Selex. Similar to Mr. Langley, counsel expects he will provide the Court with an overview of the capabilities of ELSAG cameras, the software that processes the data from those cameras, and his companies' sales to Cleveland-area law enforcement. Selex's counsel continues to engage with defense counsel with respect to their subpoena. Depending on the outcome of those discussions—and the Government and Selex's willingness to provide or agree to affidavits, documents, or stipulations—live testimony with respect to the ELSAG cameras may be narrowed or not necessary at all.

*Third* and *fourth*, we would call Padraig Devlin, the Cuyahoga County Deputy Sheriff who coordinates the ELSAG camera system for the County, and Nick DiCicco, the director of Chagrin Valley Regional Dispatch. Mr. Sturdivant expects Mr. Devlin and Mr. DiCicco to be able to testify as to (1) the system's capabilities and functionality, (2) the number and location of Leonardo cameras, (3) the scope of data collected and retained by the system, (4) the number of law enforcement officers and agencies with access to the system, and (5) any policies respecting or limitations on accessing or querying the systems.

*Finally*, Mr. Sturdivant would call Michael Thrush, the ATF specialist who ran the various searches that were used to identify Mr. Sturdivant. We expect Mr. Thrush will be able to testify

both as to (1) any policies or limitations ATF places on querying ALPR systems, and (2) how those systems were used in this case.

## II. ARGUMENT

Based on the above information, Mr. Sturdivant anticipates arguing the Government violated his Fourth Amendment rights by the ATF querying ALPR databases in this case without first obtaining a search warrant. That argument will be based largely on the Supreme Court's 2018 decision in *Carpenter v. United States*, 585 U.S. 296 (2018), as explained and extended in the Fourth Circuit's recent *en banc* decision in *Leaders of a Beautiful Struggle v. Baltimore Police Department*, 2 F.4th 330 (4th Cir. 2021) (en banc). Based on these and other cases, counsel intends to highlight several key points.

*First*, the Supreme Court has repeatedly affirmed citizens have a reasonable expectation of privacy in their movements over time. This understanding pre-dates *Carpenter*. After all, five justices agreed in *United States v. Jones* that "longer term GPS monitoring impinges on a person's expectation of privacy." 565 U.S. 400, 430 (Alito, J., concurring); *id.* at 415 (Sotomayor, J., concurring). The *Carpenter* majority deepened that understanding, highlighting the extent to which cell phones provide "an all-encompassing record of the holder's whereabouts," and such a "deep repository of historical information" that it opens "an intimate window into a person's life." 585 U.S. at 311.

Like GPS monitoring and cell-site location data, ALPRs "may collect information about your activities that you may not want the government to keep a record of: where you slept last night, what gun stores you go to, what mosque you attend, what doctor you visit, what sex-toy shop you like, what marijuana dispensary you frequent, or what gay bar you prefer." Farivar, *supra*, at 86. Indeed, in this case, by combining ALPR tracking data with data from other surveillance

cameras and systems, the government was able to track Mr. Sturdivant to and from his girlfriend's house—information it would later use to identify and interview her.

Thus, ALPR cameras, too, implicate our reasonable expectation of privacy in our movements.

***Second***, the fact there may be gaps in coverage or that data may not be as granularly precise as to location is not fatal to a Fourth Amendment claim. The data in both *Jones* and *Carpenter* had gaps—indeed, the cell phone data in *Carpenter* could only place a suspect within a wedge-shaped area ranging from an eighth to four square miles in size. 585 U.S. at 312; *Leaders of a Beautiful Struggle*, 2 F.4th at 342–43. By contrast, the ALPR data here places a car at a specific intersection, in a particular neighborhood, down to the second. As the Fourth Circuit explained, and this case illustrates, "it is almost always possible to identify people by observing even just a few points of their location history." *Id.* at 343.

From there, as with the drone-surveillance system at issue in *Leaders of a Beautiful Struggle*, police can cross reference data with myriad other surveillance systems, such as systems designed to detect gunshots, standard surveillance cameras, and more. For example, in this case, the government was able to combine its ALPR data with other data to identify and interview Mr. Sturdivant's girlfriend and track his movements to and from her home.

This further deepens the scope and seriousness of the privacy intrusion involved in an ALPR query. *Id.* at 344–45; *Carpenter*, 565 U.S.at 312 ("From the 127 days of location data it received, the Government could, in combination with other information, deduce a detailed log of Carpenter's movements . . . ."). Much like Baltimore, Cleveland also employs a ShotSpotter

gunshot detection system,[4] and as of 2022, law enforcement alone operated more than 1,500 surveillance cameras in the city (without even beginning to count those operated by private parties), Rachel Dissel and Mark Puente, *Cleveland Has Spent Millions on Police Cameras. Why are the Locations a Secret?*, The Marshall Project (Sept. 28, 2022 6:00am EDT).[5] The Government used a number of these cameras in this case, in combination with ALPR data, to build a comprehensive record of Mr. Sturdivant's movements.

**Third,** the data collected by the Cleveland-area ALPR system is at least as precise, if not more precise, than the data collected in *Carpenter* and *Leaders of a Beautiful Struggle.* For example, as in those cases, ALPR data allows law enforcement to travel back in time to track a suspect's movements even before law enforcement knew who they were looking for (or perhaps even before a crime was committed) only because it is the equivalent of "attach[ing] an ankle monitor" to every person in the greater-Cleveland area. *Leaders of Beautiful Struggle*, 2 F.4th at 341–42 (quoting *Carpenter*, 585 U.S. at 312). "Whoever the suspect turns out to be," they have "effectively been tailed" for at least 30 days (in the case of Flock cameras) or an entire year (in the case of Leonardo cameras). *See id.* at 341–42.

Indeed, the invasion here is greater than the invasion in *Carpenter* because the Government itself is doing the collecting. As the Fourth Circuit explained when discussing the drone-surveillance system in Baltimore, "[o]nly by harvesting location data from the entire population" could the law enforcement officers in this case "ultimately separate the wheat from the chaff" to

---

[4] https://mayor.clevelandohio.gov/news/city-cleveland-expands-shotspotter-technology-all-five-neighborhood-police-districts

[5] https://www.themarshallproject.org/2022/09/28/cleveland-has-spent-millions-on-police-cameras-why-are-the-locations-a-secret#:~:text=Cleveland%20has%20spent%20at,1%2C500%20surveillance%20cameras%20since%202007.

develop a list of suspects. *Id.* at 347. In that case, law enforcement planned to retain only 45 days of data, compared with the year of data Cuyahoga County apparently maintains for ELSAG cameras.

**Fourth**, while some earlier cases have rejected similar arguments related to ALPR cameras, they are distinguishable. Without addressing these cases in detail in this preliminary memorandum, Mr. Sturdivant notes for now that most of them involved far less comprehensive ALPR systems. *See e.g.*, *United States v. Rubin*, 556 F. Supp. 3d 1123, 1130 (N.D. Cal. 2021) (noting the system at issue was not comprehensive enough to provide "a detailed log of Rubin's movements" and that there may come a time when ALPR systems raise Fourth Amendment concerns); *Commonwealth v. McCarthy*, 142 N.E.3d 1090, 1105 (Mass. 2020) (recognizing a potential Fourth Amendment concern in ALPR cameras, but noting there were only two cameras involved in this particular system). By contrast, in this case, law enforcement used nearly two dozen camera hits to build a 131-page PowerPoint presentation comprehensively tracking Mr. Sturdivant's alleged movements during the relevant period. Indeed, the log it has built of Mr. Sturdivant's movement shows that, on one of the days in question, he was tagged by 5 separate ALPR cameras over the course of 20 minutes, several of them mere minutes or seconds apart.

**Finally**, the threat from this sort of system is only growing. Law enforcement agencies are already employing face-recognition software that expands the logic of ALPRs to human faces. *See, e.g.* Kashmir Hill, *Your Face Belongs to Us* (2023) (describing the rise and dangers of facial recognition technology). Flock itself already claims to be able to identify and track people, bicycles, and other items with its current system (even if it doesn't presently employ facial recognition software.) The Fourth Amendment must be able to comprehend and address the privacy concerns these new law enforcement strategies raise, and it need not wait until they reach

a dangerously granular level of specificity to do so. *See Carpenter*, 585 U.S. at 313 ("[T]he rule this Court adopts 'must take account of more sophisticated systems that are already in use or in development.' While the records in this case reflect the state of technology at the start of the decade, the accuracy of [cell phone location data] is rapidly approaching GPS-level prediction." (quoting *Kyllo v. United States*, 533, U.S. 27, 36 (2001)) (internal citation omitted)).

### III. CONCLUSION

As the Court requested, this memorandum provides only an initial outline of Mr. Sturdivant's expected suppression motion. After an evidentiary hearing, Mr. Sturdivant anticipates filing a full motion which more comprehensively (1) lays out the facts supporting his motion and (2) analyzes the authorities relevant to that motion. In the meantime, he anticipates that a motion to compel with respect to Flock may be forthcoming in the next several days.

Respectfully submitted,

/s/ *Paul M. Flannery*
Paul M. Flannery (OH: 0091480)
**FLANNERY | GEORGALIS LLC**
1375 E. 9th St., 30th Floor
Cleveland, OH 44114
Tel./Fax: (216) 367-2094
paul@flannerygeorgalis.com

*Attorney for Defendant Lawrence Sturdivant*

## CERTIFICATE OF SERVICE

I hereby certify that on February 29, 2024, a copy of the foregoing was filed electronically.

Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

/s/ *Paul M. Flannery*
Paul M. Flannery