IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:22-CR-00615 |
| | ) | |
| Plaintiff, | ) | JUDGE J. PHILIP CALABRESE |
| | ) | |
| v. | ) | |
| | ) | **DEFENDANT'S REPLY IN SUPPORT OF** |
| LAWRENCE STURDIVANT, | ) | **HIS MOTION TO SUPPRESS ALL** |
| | ) | **EVIDENCE STEMMING FROM THE** |
| Defendant. | ) | **WARRANTLESS SEARCH OF HIS** |
| | ) | **LOCATION DATA** |
| | ) | |

On the government's theory of this case, law enforcement agencies may construct massive dragnet surveillance systems made up of hundreds of automated license plate reader ("ALPR") cameras and linked to a multitude of other surveillance systems to track hundreds of thousands of citizens' movements within their jurisdiction without any basis (let alone probable cause) to suspect they committed any crime. They are further free to search the resulting database as they please without any oversight by a neutral magistrate or, indeed, any neutral third party at all. All because citizens chose to drive a car with a visible license plate (or even a blurry one) on public roadways.

That cannot be and is not the law. As Mr. Sturdivant argues at length in his Motion to Suppress (ECF No. 92), the Supreme Court's decisions in *Jones*[1] and *Carpenter*[2]—in addition to common sense—preclude the use of ALPR systems in this way. For those reasons, and because the government's attempt to rebut that argument in its opposition brief is palpably unpersuasive, this Court should grant Mr. Sturdivant's motion to suppress.

---

[1] *United States v. Jones*, 565 U.S. 400 (2012).

[2] *Carpenter v. United States*, 585 U.S. 296 (2018).

I. ARGUMENT

Many of the government's arguments are adequately addressed in Mr. Sturdivant's Motion and, in the interest of brevity, are not readdressed here. Three flaws in the government's theory, however, merit further attention: (1) its misunderstanding of the facts underlying, and the reasoning of, the *Carpenter* decision, (2) its failure to provide more than speculation to support its "inevitable discovery" claim, and (3) its distortion of the good-faith exception to support its officers' actions.

### A. The government misunderstands the facts, reasoning, and implications of *Carpenter*.

The government, as one would expect, builds most of its opposition brief (ECF No. 97) around an attempt to cabin the *Carpenter* decision to escape the decision's application to this case. Even so, it can do so only by doing violence to the Supreme Court's reasoning and relying on a logic of the Fourth Amendment that finds support only in the *Carpenter* dissent.

***First***, the government misstates what *Carpenter* found was protected by the Fourth Amendment and misrepresents what Mr. Sturdivant claims is protected in this case. The government suggests that *Carpenter* was about sensitive data collected by and stored on a cellular telephone, as if the case was concerned with a possessory interest in that data, and it argues that only such a possessory interest supports a Fourth Amendment challenge. (ECF No. 97 at 2, 20.) Then it says that, unlike that data, the exterior of Mr. Sturdivant's car and his license plate were willingly displayed to the public and, thus, not protected by the Fourth Amendment. (*Id.* at 1, 19.)

As for the government's bizarre argument that Mr. Sturdivant cannot challenge the collection of ALPR data because he has no possessory interest in it, the only actual support it musters for that position is a citation to Justice Thomas's ***dissent*** in *Carpenter*. But as should be obvious, the majority in *Carpenter* rejected this property-rights-based understanding of the Fourth

2

Amendment, relying instead on the traditional "reasonable expectation of privacy" test that the Supreme Court established in *Katz v. United States* and has been the law of the land for decades. *Carpenter v. United States*, 585 U.S. at 304. Contrary to the government's suggestion to this Court, the *Carpenter* Court also stressed multiple times that its decision did ***not*** depend on a possessory interest in location data itself—indeed, could not have because the data was held by a phone company—but was based on citizens' "reasonable expectation of privacy in the whole of their physical movements." *Id.* at 310. In fact, the government admits as much elsewhere in its brief, (ECF No. 97 at 3), though it does not acknowledge the extent to which its admission undermines its argument.

Mr. Sturdivant, for his part, relies on the same reasonable expectation of privacy in his physical movements that the defendant in *Carpenter* did. Contrary to the government's argument, he does not claim that he somehow has a reasonable expectation of privacy in the external appearance of his car or his license plate number. He acknowledges that he does not have any more expectation of privacy in those than Carpenter had in his cell phone number, its ICMI number, or its external appearance. What he does have a reasonable expectation privacy in, however, is the totality of his physical movements—and that is the expectation the government invaded with its ALPR surveillance system.[3]

***Second***, the government mischaracterizes the type and particularity of data at issue in *Carpenter*. Unlike such data, the government says, ALPR data "cannot be used to track the totality of anyone's movement." (ECF No. 97 at 3.) The government thus suggests that the cell-site

---

[3] This also defeats the government's odd reliance on so-called "pole camera" cases approving police use of surveillance cameras to monitor a single location for extended periods of time. (ECF No. 97 at 23, n.8.) Such cameras obviously cannot track a person's physical movements from place to place in the way that cell-site location information or ALPR data does.

location information ("CSLI") at issue in *Carpenter* was incredibly precise, quoting out of context a line from the majority opinion analogizing it to an ankle monitor. (*Id.* at 25.) Indeed, it continually misdescribes CSLI data as if it provided GPS-like precision about where a person slept at night, what churches they attend, and so on. (*Id.* at 25–28.)

But CSLI data in *Carpenter* could only track a suspect's location to "within a wedge-shaped sector ranging from one-eighth to **four square miles**." 585 U.S. at 312 (emphasis added). While the Court recognized that technology was evolving and "rapidly approaching GPS-level precision," *id.* at 313, that was emphatically not the case in *Carpenter* itself and the same is true of ALPR cameras which are increasing in precision and functionality as they spread across the nation at a geometric rate. *See* University of Michigan, Ford School of Public Policy, *Automated License Plate Readers widely used, subject to abuse* (Feb. 22, 2023), available at https://stpp.fordschool.umich.edu/news/2023/automated-license-plate-readers-widely-used-subject-abuse (last visited Dec. 18, 2024); *see also* The Week, Justin Klawans, *The pros and cons of license-plate reader technology* (Dec. 17, 2023), available at https://theweek.com/tech/automatic-license-plate-readers (last visited Dec. 18, 2024); Campus Safety Magazine, Press Release, *Genetec Introduces AutoVu ePlate Finder for Mobile Devices* (June 8, 2024), available at https://www.campussafetymagazine.com/press-releases/genetec-introduces-autovu-eplate-finder-for-mobile-devices/135586/ (last visited Dec. 18, 2024). Worse still, this growth has not been accompanied by regulations meaningfully restricting their use. *Id.*

Moreover, contrary to the government's suggestion, CSLI data is not keyed to a location transmitted by a cellular telephone. Instead, it records the cellular telephone's location at set points in time relative to fixed cellular telephone towers (comparable to a car's location in relation to a fixed ALPR camera). CSLI data also only tells officers what cellular telephone tower is closest to

4

a suspect at any given time and, at best, which of the cellular telephone tower's nodes (each covering 120 degrees as shown in the diagram below) is pointed towards the cellular telephone:



*See* National Association of Criminal Defense Lawyers (NACDL) Primer, *Cell Phone Location Tracking*, available at https://www.nacdl.org/getattachment/d459deeb-834d-4222-a843-86376c47c0c7/cellphonetrackingprimer.pdf (last visited Dec. 18, 2024); Chathura Illangakoon, R. D. McLeod, Marcia Friesen, *Agent Based Modeling of Malaria*, 2014 IEEE Canada International Humanitarian Technology Conference, at 6 (July 2015), available at https://www.researchgate.net/publication/282890050_Agent_based_modeling_of_malaria (last visited Dec. 18, 2024). Thus, ALPR cameras are, in some ways, more precise than CSLI data because ALPR cameras place a suspect vehicle at a specific intersection (or other camera location) whereas CSLI data can only place a suspect phone somewhere within a wedge-shaped area near a cellular telephone tower.

Yet, despite the limitations of CSLI, the Supreme Court still expressed concern that it had the potential to provide "an intimate window into a person's life, revealing not only his particular movements, but through them his 'familial, political, professional, religious, and sexual associations.'" *Id.* at 311 (quoting *United States v. Jones*, 565 U.S. 400, 415 (2012) (Sotomayor, J., concurring)). And, while *Carpenter* takes time to explain how a cellular telephone follows a person to *more* locations than the car at issue in *Jones*, a majority of the justices in *Jones* itself

raised the same concern about tracking a person's movements in a car. *See Jones*, 565 U.S. at 413–18 (Sotomayor, J., concurring); *id.* at 418–31 (Alito, J., concurring).

In short, given the number and placement of ALPR cameras in the Cleveland area, the ALPR system at issue here raises the same concerns that were at issue in *Carpenter* and the government's attempt to distinguish the two technologies is unavailing. Documents produced in response to defense subpoenas identified approximately 922 Flock cameras across Cuyahoga County and neighboring counties, along with 75 ELSAG cameras[4] in Cuyahoga County, for a total of 997 cameras—and these are only the *publicly-owned* cameras. (ECF No. 92, pp. 4, 6.) There are also numerous privately-owned cameras that are integrated into the law enforcement system. (*Id.* at pp. 5–7.) These cameras, especially when tied into the numerous other surveillance technologies employed by law enforcement, provide an intimate look into a person's movements. Beyond that, both ALPR and cellular technologies locate a suspect in relation to fixed points over a period of time, enabling law enforcement to create a log of that person's movements.[5] And, in

---

[4] "ELSAG cameras" are a subsystem network of fixed ALPR cameras and software provided by Selex ES, a subsidiary of Leonardo S.p.A which are more particularly described in the Motion to Suppress.

[5] The government makes much of the fact that *Carpenter* involved 12,898 data points related to Carpenter's movements while this case involves only around two dozen hits on Mr. Sturdivant's license plate (ECF No. 97, at 28), but that is only because the technologies have different refresh rates. Cellular telephones continually reconnect to cellular towers to maintain service for phone calls and other functions. Alison Healey, *Answering the Call: The Latest News on Tracking Individuals via Their Cellular Phones*, Federal Law Enforcement Training Centers, available at https://www.fletc.gov/sites/default/files/imported_files/training/programs/legal-division/downloads-articles-and-faqs/research-by-subject/miscellaneous/TrackingIndividualsviaTheirCellularPhones.pdf (last visited Dec. 18, 2024) (noting that cellular telephones register their locations with the nearest cellular tower approximately every seven seconds). ALPR cameras have no analogous need to take a picture of a car every few seconds to establish that a car is in a particular location at a particular time and, as a result, create fewer data points. If anything, this difference is a result of the fact that ALPRs are designed to serve law enforcement by detecting suspects' movements and traffic violations and,

both cases, "the retrospective quality of the data here gives police access to a category of information otherwise unknowable:"

> In the past, attempts to reconstruct a person's movements were limited by a dearth of records and the frailties of recollection. With access to CSLI [or ALPR data], the Government can now travel back in time to retrace a person's whereabouts, subject only to the retention polices of the wireless carriers [or police departments] . . .. Critically, because location information is continually logged for all of the 400 million devices in the United States [or all cars in the case of ALPR]—not just those belonging to persons who might happen to come under investigation—this newfound tracking capacity runs against everyone. Unlike with the GPS device in *Jones,* police need not even know in advance whether they want to follow a particular individual, or when.

*Cf. Carpenter*, 585 U.S. at 312. There is, thus, no reason to treat the two technologies differently.

Moreover, in downplaying the significance of the ALPR search in this case (somehow suggesting that those parts of its 131-page dossier on Mr. Sturdivant's movements that show "a combination of those ALPR hits and other data" don't count), (ECF. No. 97 at 28), the government also ignores that the ALPR system is part of a broader, far-reaching system of surveillance, including standard surveillance cameras located around the Cleveland area. Thus, once the government gets a license plate hit tying a vehicle to a specific location, operators can use these other surveillance tools to further track a person's movements based on those hits. It is the use of this entire ALPR system to track his physical movements that Mr. Sturdivant challenges, not just the net of ALPR cameras standing on its own.

**Third**, the government's attempt to rely on non-binding and mostly unpublished decisions from other jurisdictions rejecting challenges to ALPR systems is not persuasive. For starters, several of these cases involved much less pervasive ALPR systems or more targeted uses of those systems than those at issue here. *See United States v. Rubin*, 556 F. Supp. 3d 1123, 1129 (N.D.

---

unlike cellular telephones, do not generate data points extraneous or redundant for that purpose. That makes them more invasive and violative of the Fourth Amendment, not less.

7

Cal. 2021) (relying on the lack of detailed surveillance records to conclude that the ALPR searches at issue were less invasive than in *Carpenter*); *United States v. Graham*, Crim. No. 21-645 (WJM), 2022 WL 4132488, at * 5 (D.N.J. Sept. 12, 2022) (use of ALPR database was "limited to a single occurrence on a single day and did not reveal private details of" the suspect's life). In contrast to those cases, the use of the extensive ALPR system (described at length in Mr. Sturdivant's opening brief) in this case not only led the police to Mr. Sturdivant's door, but also identified his girlfriend and her residence—indeed, the government was even able to show on which nights Mr. Sturdivant stayed overnight there.

While true that some courts have rejected challenges to ALPR systems in more categorical terms, their decisions display the same misunderstanding of both *Carpenter*'s holding and the specificity of CSLI data that the government displays in this case. It is also worth noting that a number of courts have expressed concerns about ALPR searches and their potential to infringe on Fourth Amendment interests, even when rejecting a challenge to a particular use of the technology. *See, e.g., United States v. Brown*, No. 19 CR 949, 2021 WL 4963602, at * 3 (N.D. Ill. Oct. 26, 2021) ("These cameras and databases are a technological advance; they capture license plates passing by at a high rate of speed and in the dark of night. Mining such enhanced historical information to piece together a person's movements might encroach on society's expectations and justify Fourth Amendment intervention."); *Comm. v. McCarthy*, 484 Mass. 493, 506, 142 N.E.3d 1090, 1104 (2020) ("With enough cameras in enough locations, the historic location data from an ALPR system in Massachusetts would invade a reasonable expectation of privacy and would constitute a search for constitutional purposes."); *United States v. Yang*, 958 F.3d 851, 863 (9th Cir. 2020) (Bea concurring) ("I understand that ALPRs may in time present many of the same issues the Supreme Court highlighted in *Carpenter*.").

8

For all these reasons, the Court should reject the government's efforts to divert attention from the obvious implications of *Carpenter* and should grant Mr. Sturdivant's motion.

**B.     The government would not have inevitably discovered the evidence it obtained through unconstitutional ALPR searches in this case.**

Next, the government argues that—because Mr. Sturdivant reported his car stolen after the police attempted to arrest him—it was inevitable that law enforcement would have identified and arrested him. (ECF No. 97 at 19, 32–34.) But that position is wrongheaded on two fronts.

*First*, by the government's own (implicit) admission, the stolen-vehicle report may not, in fact, have been independent of the ALPR search. In a footnote, it reveals that two Cleveland Police Officers tried to stop a black Camero on December 26, 2021, possibly based on the license plate number the government only obtained through the ALPR search. (*Id.* at 17, n.5.) The government also suggests that this attempted stop, which was not disclosed to the defense before the government filed its brief (even though it has known, for months, that Mr. Sturdivant intended to challenge the ALPR search), may well have motivated Mr. Sturdivant to make his stolen vehicle report. (*Id.*) If so, that would be fatal to the government's inevitable discovery theory.

As the government itself recognizes, (ECF No. 97 at 32–33), the inevitable discovery doctrine, which allows police to use evidence collected in an unconstitutional search, requires a compelling reason—such as an independent, untainted investigation—to believe that police would have found the evidence "had the illegality never occurred." *See United States v. Cooper*, 24 F.4th 1086, 1091–94 (6th Cir. 2022). Here, if (1) the officers who performed the attempted stop knew the license plate number of Mr. Sturdivant's car because of the ALPR search, and (2) that attempted stop motivated him to make the stolen-vehicle report, then the taint from the unconstitutional search extends to the stop and report. And inevitable discovery does not apply.

9

At the very least, Mr. Sturdivant should therefore be allowed to probe the underlying facts of this attempted stop at a hearing and is entitled to further discovery on the issue.

***Second***, even if the stolen-vehicle report had not been tainted by the earlier ALPR search, it would not have led law enforcement to evidence of the robberies underlying Mr. Sturdivant's indictment. The reason for that is simple: government agents did not find ***any*** incriminating evidence in Mr. Sturdivant's car itself. Even if that car matched the description of the car used in the robbery, law enforcement would have had no reason (upon stopping and searching it) to believe that it was *the* black car used in the robbery. Indeed, assuming that Mr. Sturdivant was driving it, they would have realized that—because it was being driven by its registered owner—the car either was not stolen after all or had been successfully recovered. To identify and discover incriminating evidence, law enforcement would have either needed to search Mr. Sturdivant's cellular telephone, which would require a warrant, or his ALPR data, which should require a warrant for all the reasons discussed in Mr. Sturdivant's motion and this brief.

***Third***, the idea that a stolen vehicle report would have led the police to locate and stop Mr. Sturdivant's car is dubious at best. Somewhere between 600 and 700 cars are stolen ***every month*** in the Cleveland area. *See* Fox 8, Ed Gallek, *Where cars are most likely to be stolen in Cleveland: I-Team*, (updated Mar. 1, 2023, 6:01 a.m. EST), available at https://fox8.com/news/where-cars-are-most-likely-to-be-stolen-in-cleveland-i-team/ (last visited Dec. 18, 2024). Worse still, only around two-thirds of cars are ever recovered and "[t]he vast majority of cases remain unsolved." Cleveland.com, Cliff Pinckard, *Car thefts take dramatic jump in Cleveland in 2023: The Wake Up from Monday, Aug 14, 2023* (updated Aug. 14, 2023, 6:13 a.m.), available at https://www.cleveland.com/metro/2023/08/car-thefts-take-dramatic-jump-in-cleveland-in-2023-the-wake-up-for-monday-aug-14-2023.html (last visited Dec. 18, 2024). Whatever else might be

10

said about these crime and clearance rates, reporting a car stolen is no guarantee that the car will be located and even less of a guarantee that the thief will be found and the case closed. To suggest that the mere filing of a stolen-vehicle report would lead police to mount a comprehensive search for the vehicle and then, upon locating it, tie it to a robbery based on a vague and generic description of the suspect vehicle is rank speculation. That dooms the government's argument.

The Sixth Circuit has admonished that, in the context of claims of "inevitable discovery," "courts must keep speculation at a minimum by focusing on 'demonstrated historical facts capable of ready verification or impeachment.'" *United States v. Cooper*, 24 F.4th 1086, 1094 (6th Cir. 2022) (quoting *United States v. Ford*, 184 F.3d 566, 577 (6th Cir. 1999)). Indeed, the Sixth Circuit's "cases usually entail little guesswork because they involve routine practices":

> that an airline would, pursuant to its official policy, open the defendant's lost luggage; that police would follow standard procedure to inventory a vehicle before having it towed; or that upon arresting a suspect, police would routinely search his person, or ask for his name

*Id.* "The risk of intolerable speculation increases, however, when the government's theory of discovery relies on the irregular actions of third parties." *Id.*

Here, the government's theory is not premised on any sort of "routine practice" and is instead premised on a purely speculative theory about what a third party it does not control (the Cleveland Police Department) **might do** about one of hundreds of stolen vehicle reports it received in a particular month. It also requires the Court to assume that, even if officers managed to locate that vehicle, they would have tied it to the robberies even with no evidence in the car to make the connection. And so on. This is simply too much impermissible speculation to justify applying the inevitable discovery doctrine.

11

### C. Government agents who gamble on uncertain legal issues are not entitled to the protection of the good faith doctrine.

Finally, the good-faith exception to the exclusionary rule does not apply in this case. The government argues that the officers here were entitled to rely in good faith on the absence of a definitive case precluding them from acting as they did in this case and so, the good-faith exception applies. (ECF No. 97 at 31–32.) That is not the law.

The Supreme Court has held that officers are entitled to rely on **binding** caselaw that supports their actions. *Davis v. United States*, 564 U.S. 229, 240–41 (2011). But "*Davis* does not refer to persuasive or well-reasoned precedent, permit reliance on a growing trend in decisions, or purport to apply to situations in which a plurality, majority, or even an overwhelming majority of circuits agree." *United States v. Ortiz*, 878 F. Supp. 2d 515, 539 (E.D. Pa. 2012); *accord. United States v. Lara*, 815 F.3d 605, 613 (9th Cir. 2016) ("We decline to expand the rule in *Davis* to cases in which the appellate precedent, rather than being binding, is (at best) unclear."); *United States v. Burston*, 806 F.3d 1123, 1129 (8th Cir. 2015) (refusing to apply *Davis* where no binding case specifically authorized a similar search under similar circumstances). "Instead, *Davis* states, repeatedly, that it applies to *binding* precedent" only. *Ortiz*, 878 F. Supp. 2d at 539–40 (emphasis in original).

To conclude otherwise would be contrary to the entire basis of the good faith doctrine, which protects law enforcement who reasonably rely on some ***external*** and ***apparently conclusive*** authority that later turns out to be incorrect. Thus, law enforcement are entitled to rely on an apparently valid warrant issued by a neutral magistrate, *United States v. Leon*, 468 U.S. 897, 922 (1984); or on binding appellate decision issued by neutral court, *Davis*, 564 U.S. at 240–41; or on a statute passed by a duly elected legislature, *Illinois v. Krull*, 480 U.S. 340, 350 (1987); or on a database maintained by someone other than the officer, *Arizona v. Evans*, 514 U.S. 1 (1995).

12

That does not mean, however, that officers are able to rely on their own reading of the relevant authorities, run the risk that they have guessed wrongly about the Fourth Amendment's scope, and then seek to hide behind the good-faith exception. They must, instead, be relying on some applicable authority beyond themselves. Because only then can it be said that excluding the evidence would be to penalize law enforcement for someone else's (e.g., a court or legislature's) error. *See Davis*, 564 U.S. at 240–41; *Krull*, 480 U.S. at 350.

To extend the exclusionary rule to cases like this one "would give police 'little incentive to err on the side of constitutional behavior.'" *United States v. Lee*, 862 F. Supp. 2d 560, 569 (E.D. Ky. 2012). "If a police officer conducts a search based on a non-binding judicial decision—that is, an opinion by a trial court, an unpublished opinion by his own circuit's court of appeals, or a published opinion by another circuit's court of appeals—he is guessing what the law might be, rather than relying on what a binding legal authority tells him it is." *Id.* And "[t]he *Davis* exception for good faith reliance on controlling precedent does not reach so far as to excuse mistaken efforts to *extend* controlling precedents." *United States v. Jenkins*, 850 F.3d 912, 920 (7th Cir. 2017) (emphasis in original). If officers decide to take the risk and bet that courts will extend the reach of current decisions, they take the risk that courts upset their expectations—and they do so without the protection of the good faith doctrine.

Here, there was no binding precedent supporting law enforcement's actions and the government points to none in its brief. Existing binding third-party doctrine cases do not address ALPR searches. ALPR search cases from other jurisdictions are not binding. And cases like *Carpenter*[6] and the others cited in Mr. Sturdivant's opening brief and above instead suggest that

---

[6] Oddly, the government argues in its brief that the Sixth Circuit's decision to apply the good faith exception in Carpenter's case when it was remanded somehow supports its good faith claim here.

13

the law is moving in another direction. Indeed, as discussed above, even courts rejecting particular challenges to ALPR searches have suggested that such systems might raise Fourth Amendment concerns when—as here—they grow large enough to allow widespread surveillance of citizens' movements. Thus, the good-faith exception does not apply and the Court should grant Mr. Sturdivant's motion.

## II.   CONCLUSION

In short, the government has provided no compelling reason why this Court should accept its position that the government is entitled to create and maintain a dragnet, retroactive database tracking citizens' movement and query it at law enforcement's leisure. The ALPR system at issue here is legally indistinguishable from the facts underlying *Carpenter*—despite the government's misguided attempts to argue otherwise. Its inevitable discovery arguments are speculative at best. And the good faith doctrine does not apply. This Court should therefore grant Mr. Sturdivant's Motion to Suppress.

Respectfully submitted,

/s/ *Paul M. Flannery*
Paul M. Flannery (OH: 0091480)
Susan A. Jacobsen (OH: 0100620)
Flannery │ Georgalis, LLC
1375 E. 9th St., 30th Floor
Cleveland, OH 44114
Tel: (216) 702-4463 (Paul)
Tel: (216) 466-0706 (Susan)
Fax: (216) 367-2120
paul@flannerygeorgalis.com
sjacobsen@flannerygeorgalis.com

*Attorneys for Defendant Lawrence Sturdivant*

---

(ECF No. 97 at 30.) But the obvious problem with that analysis is that *Carpenter* had not been decided when the search of Carpenter's cellular telephone data occurred.

## CERTIFICATE OF SERVICE

I hereby certify that on December 18, 2024, a copy of the foregoing was filed electronically.

Notice of this filing will be sent to all parties through the Court's electronic filing system.

/s/ *Paul M. Flannery*
Paul M. Flannery (OH: 0091480)

*Attorney for Defendant Lawrence Sturdivant*